Mr. Airey. Yes, Your Honor. You may proceed. Thank you, Your Honor. This case should never have ended the way it ended. What we have here is a very complex financial transaction, a tax credit transaction that involved multiple loans, involved tax credits, involved equity injections, et cetera. And what happened is the FDIC sold one piece of the transaction, which was bought by the appellee. If we look at it from a holistic standpoint, the way the transaction was supposed to work and the way tax credit transactions work, at the end of the day, the original loan, the bridge loan, which is what's being sued on here, should have been paid for by the tax credit. With the bridge loan, like a construction, it would finance the beginning of the transaction. And so what happened is that rather than the trial court viewing it holistically, that this was part of an entire network of interconnecting transactions, it allowed the appellee to proceed as if it was a one-off transaction. That was the problem. Now, why are we here? We're here because although there were numerous general issues of material fact, the trial court ignored those, granted summary judgment, and cast the appellants in multiple judgments totaling $1.8 million. Now, one of the problems we had here, our affirmative defenses included the fact that there was two credit memos. Anybody affiliated with banking knows that it's the credit memo that sets the stage and describes for everyone what the transaction is about. Now, we have three handouts that are going to use the normal argument. And those handouts, I think, flesh out exactly what we're trying to say. There's two credit memos, one from 2012, the next one from 2015, and then there is a memorandum that was attached to it that goes on basically to describe what the maximum exposure was for the appellant. Now, if you look at the record of appeal page 1810, that's the 2012 credit memorandum. And one of the issues here that the trial court was having was whether or not it was signed. Okay? We basically argued as an affirmative defense, we said, look at this. Even though the promissory note was for $1.5 million, the transaction was basically not to ever have the appellants have to pay this thing back. All right? Tax credit transactions are set up in such a way where each of the separate loan transactions offset each other. So at the end of the day, what happens is, there's a seven-year period. At the end of the day, you come and you pay a nominal sum, transfer fee of $1,000, $8,000 in credit memo, you were hit with a dense doom defense. It basically says, FDIC can sell things and, you know, you can't go outside the promissory note. Well, you can, under dense doom, if you can show that there was a written agreement, that agreement was part of the record, and it was signed by the parties. And one of the issues we had, which is a general issue, material fact, is whether or not Dr. Oppen actually signed. Now, we had great difficulty in getting these documents. We made three FOIA requests on the government. The first FOIA request came back, we're not giving you anything. The second FOIA request came back with a 2012 memo, a credit memo. And then the third FOIA request came back with the 2015. And what we had here was, you'll notice on there, there's like areas that are grayed out, areas that show that something's blocked out. It shows B6, whatever, where signatures were, it might show B4 or something else. And so our problem is, you can't really see the signature because it's blocked out. And what the government does is, it blocks out, you know, account numbers, it blocks out signatures, anything that somebody might be able to use, and fraudulently, it gives you fraudulent behavior. Our point was this, was judge, look, next to our client's name is where it's blocked out. That's where the signature was. And the judge basically says, well, I'm looking at this, but it's not really clear whether he signed it or not. And I'm saying, judge, once you reach the conclusion it wasn't clear, that created a genuine issue of material fact. And you should have allowed us then to go back again to the federal government and say, look, can you give us an unredacted document, okay, or allow an affidavit from our client who would say, yes, I signed it. So I think what we have here is the unusual situation where... So you're saying, if you were able to produce a signature, you would meet all the other requirements under DENCHGEN? Yes, and I think we do. And if you look at 2015, you'll see that underneath where they blotted it out, it looks like there's a signature there. And that's it was unclear. So if you look on this, it's record of the court of appeal page 2347. And if you look at the top... So you've got a date that would show his contemporaneous with... It was signed the same day as... What happened is this. In 2012, the original bridge loan was signed. Transaction started. There was a delay in getting tax credits. And so what happened is they amended the original bridge loan up to about $100,000, okay, with the idea that, hey, we have additional expenses have occurred. I just want to be sure, because I'm looking at four things under this DENCHGEN document. I just want to be sure you're telling me, but for a signature, every other requirement is met. Yes, and we say there was a signature. So there really isn't even a but for. We're basically taking the position that we met all the requirements. The other thing is this, that one of our affirmative defenses is fraudulent inducement. We're basically saying Ashton Ryan, who's currently in jail, Brad Calloway, who's currently in jail, fraudulently induced our client to put up his property and to sign all of these various documents. Now, and so we're saying that even if you said we could not vary the terms of the note because of DENCHGEN, I think the credit memos also show the fraudulent inducement, because they basically say if you look at record on appeal document 2351, it basically says, should there be a shortfall, which could result on interest accruing while awaiting the state certifications, the personal cash flows of Dr. Eugene Ackman can easily support up to a shortfall of 125,000. Okay. Basically, they're basically saying worst case scenario, the most this guy was going to owe is $125,000. That's in the credit memorandum? That's in the credit memorandum. And that's the interoffice memorandum that's dated January 26, Brad Calloway, who's the loan officer and the executive vice president who was on this and who convinced our client to sign all these documents. But basically, anybody familiar with a tax credit transaction knows that it's a lot of fiction. Okay? So what you have here is a series of notes. You have a leverage loan. The leverage loan, our client's company was not to borrow on the leverage loan. They were the lender, and they loaned the money to the tax credit entity. How can you wear all these hats? That's the way a tax credit transaction works. Now, at the bottom of all this funnel where the money's coming down, you end up with what they call calicke notes. Okay? And the calicke notes A and B, all right? Now, in the calicke notes, that's where you get to the real real estate, the corporate behavior properties, all the way down the line. But what you have here is at the end of the day, calicke note B, calicke note A get wiped out. One becomes a permanent subsidy. That's the B. The loan A gets wiped out, the leverage loan. Now, why is the leverage loan important? Our client was the lender on the leverage loan. $2.9 million. That was put in the account by the bank, and the interest on that was to pay and keep current the interest on the two calicke notes. Now, here's where the problem comes. The bank fails in 2017. Up to the failure of the bank, the bank was making those payments from the account. Once the FDIC took over, it stopped making the payments. I think they call that a default. That's the true default that the trial court never let us proceed with. Secondly, what happened is FDIC sells the notes to a company called OSK. They don't make the payments, interest payments on the calicke notes either, on the default. Then by equities, the appellee in this case ultimately acquires the note. It doesn't make them either. What we have here is you're pointing at the wrong actor in terms of defaults. The defaults occurred when the bank failed, and the FDIC, which stood then in the shoes of the bank, dropped the ball. Now, we have over $4 million in tax credits, and the appellee says, I had a note for $1.5 million. Well, it's easy to see that if the tax credits had been the way they should have been, there would have been no debt owed on the note that's being sued upon in this court. What we're basically saying is that there were several genuine issues of material fact that the trial court just glossed over. The trial court went so far as to say, well, look, even if you could prove and get around a dense bill, the guy signed the guarantee agreement. Well, let's look at that logically. A guarantor says, I agree to pay up to what the primary outlaw has to pay. If the primary outlaw only has to pay $125,000, why should the guarantor have to pay $1.8 million? It logically doesn't make sense. It defies any concept of law one had, and it runs contrary to Louisiana's civil code, which basically says that the obligation of a guarantor is accessory. It's accessory to what? The obligation to the primary debtor. So it can't be higher. But in this case, because of what happened, that's the fiction you have. You have a fiction here where appropriated deductions, maximum liability, is $125,000, but the guarantors, who are really the appellants in this case, have been cast in judgment, are basically stuck with $1.8 million debt. Now, for some people, that's not a lot of money. But for my client, Dr. Altman, that's a bet the ranch kind of situation. That basically is something he didn't anticipate, that something he was told would never happen. And I say, if the trial court had taken a holistic approach to looking at the transaction, we would have seen that there's no way possible for there to be a debt code on the bridge loan. It's a bridge loan. The tax credits basically pay off the bridge loan. Now, why didn't this happen? Let's take a look at it. The tax credit transaction basically trues up after seven years. You have to have a seven-year period. At the end of seven years, what happens is the bridge loan gets paid off with the tax credits. The other indebtedness true up with one another and get paid off and washed out, all right? And then at the end of the day, you have that little transfer fee of $1,000 and $8,000 for legal fees on the entity that you're dealing with. That's the way it's supposed to happen. The FDIC should never have sold the bridge loan as an isolated transaction. It wasn't an isolated transaction. And in fact, it was really a fiction because there was never going to be the possibility of a default if the transaction had gone the way it went. Now, let's talk about defaults. The bridge loan... I guess I'm trying to understand. What you're saying is this is a loan that only had to be paid back if it was paid back with tax credits. Yes. That's what I'm saying. And let me explain where the glitch came in. The seven-year period, the loan, the bridge loan matured in 2016, a year before the bank failed, all right? Keep that number there. Now, what would happen then is the seven years would run from 2012, which is when the loan was originally done, to 2019. The bank failed in 2017, two years before the seven-year period came up. Now, remember, the FDIC took over. It was supposed to stand in the shoes of the bank. The bank was supposed to keep its collicky loans, currents, okay? The bank was supposed to do all this. That stopped. And so what happened is instead of somebody moving the tax credits over and saying, tax credits wiped this out, it didn't happen. Now, my client should not be punished because it didn't happen. It should have happened. The transaction, if you look at the entire transaction, contemplated that that would happen. Now, there's some other genuine issues. My client is the lender on the leverage loan, loaned in $2.9 million, was put into account at First NBC Bank. We have a genuine issue of material facts. Where is the money? Where is it? At this point in time, we're not even allowed by the trial court to go down that road to say, where's the money? Where is it? What happened to it? So the simple resolution to this case, we think, is for this court to vacate the summary judgment and the intended monetary judgments, remand the case back for further proceedings, and hopefully we get a trial on merits where we can do a number of things. One of the other things that the court did was it closed the file after it granted this and ignored our third-party demand, which was based on the fraudulent inducement. So we never even got to even proceed there. I think the court just basically said, well, it's over. The people who you brought the fraudulent inducement came, they were convicted, they're in jail, so it's over with. It's not over. And respectfully, I suggest to you that my client be allowed to have his day anyway. Thank you. All right. Thank you, Mr. Aaron. May I please support Charles Stern on behalf of the appellee and plaintiff below, BYU Equities. What you just heard from Mr. Aaron demonstrates exactly why the Dench Doctrine exists, demonstrates exactly why it was codified in 12 U.S.C. 1823. His whole contention, based on some credit memos from 2012 and 2015, was that his client was fraudulently induced into signing the documents for this so-called bridge line. The 2015 note typically has been referred to in the litigation as the new bridge line. Dench and the subsequent Supreme Court decision in Langley made clear that fraudulent inducement by a lending institution that has subsequently failed is not a defense that is federal law. A brief quote. This is from Macklemore v. Landry, which is a 1990 decision from this court. Following Langley, we have held that misrepresentations to borrowers cannot be asserted as a defense to recovery by the FSLIC on facially unqualified loan documents. The case is dated a little bit because the FSLIC doesn't exist anymore, but back in the early cases involving failures and savings loans, and a lot of them were in Louisiana and Texas. So there's plenty of Fifth Circuit law. The whole point of those decisions and of the subsequent codification of the decisions is to prevent exactly what's going on here. The FDIC is charged with liquidating the assets of the failed institution. Those assets consist primarily of loans. It's sold to an outfit called OSK, totally unrelated to any of the parties here. OSK subsequently sold it to BY. We're protected by the same protections under DENCH that apply to the FDIC. So in order for a document, oral misrepresentations are clearly not cognizable against us. They may have been valid against FNBC, but that's not something for us to determine. So let's look briefly at the only two documents that they belie. There's this 2012 credit memo. Well, it fails for a couple of reasons. It fails under 1822E1 because it's not executed temporaneously with the 2015 loan. And by the way, the court below assumed without deciding that Dr. Oppmann had signed these things. Its decision was based on the contents of these documents and on the fact that everything else that was offered below by the defendants consisted of oral misrepresentations. The statute, I'm looking at the statute E1B. That's what we're talking about, E1B. I believe it's, yeah, I believe it's B. That the agreement has to have been executed by the depository institution and any person claiming that interest at an adverse interest they're under, including the obligor, contemporaneously with the acquisition of the The asset in this case would be the 2015 New Bridge Loan. Okay, New Bridge Loan 2015. 2015. The original tax credit transaction is 2012. That's why you see dates from 2012, but the loan at issue here was in 2015. Okay, and when was that, that's the asset? That is the asset that was ultimately acquired. When was it acquired by the depository institution? I'm just trying to see what you're saying. It was acquired when the loan document, when the note was executed for 2015. Okay, so you're saying of this first one, one of the flaws you're saying is that it's not contemporaneous because it's 2012. Right, but there's a second flaw, right? What they're, essentially what Mr. Aaron is trying to say is because there was an expectation that the loan in 2012 and the loan in 2015 were going to be paid off by tax credits, that he's trying to convert that into an agreement that the loan could only be enforced by essentially grabbing the tax credit. That's not what this document says, and it's not what the loan documents say. All the loan documents are in evidence. What this document says is there's a primary source of payment. The primary source of payment was expected to be the tax credits, but there's also a secondary source of payment right there on the document. This is a 2012 document, but you'll see something similar in 2015. And the secondary source of repayment is guarantor support, and the guarantors are listed, and liquidation of collateral, and the collateral does not just include tax credits. The collateral includes assignment of math in 2012, all sorts of other things, all sorts of assignments. So right there on the face of the document, it's saying we expect, you know, the plan is it's going to be paid off by tax credits, but there is no agreement that is only enforceable against the tax credits. It's just like I execute a mortgage. The plan is that my income is going to support that loan, but I execute the mortgage because things don't always go according to plan. And that's what this document shows. There is nothing here that says or restricts the ability to collect on this loan to tax credits. I have no idea what happened to the tax credits and why it didn't pay off the loan. That's the whole point of damage. I don't need to know. What I need to know, what DUI needs to know is there's a note, there's a security agreement, there's a guarantee, and the note's unpaid. And all of that evidence is in the record. And they don't contest any of that evidence. Their position is we were bamboozled by people at FNBC. We were led to believe that this note would be paid off by tax credits, and it wasn't. And therefore, BY Equities coming in years later, buying this loan, seven years after the original transaction, for almost five years after the 2015 loan, which turned out at the end of 2016. I mean, this note was in default from 2016 forward. The 2015 document has an additional problem, which is it was not presented in opposition to the summary judgment motion. It wasn't even requested in a FOIA request until late August of 2024, about a week before the discovery cutoff in this case. They filed it in connection with the Rule 60 motion. The case by late 2024 was over four years old. They had gotten the 2012 memo in early 2021. Under Rule 60B, they have to, if they're going to come up with newly discovered evidence, they have to demonstrate that they exercised reasonable diligence in trying to get it. And the lower court found that they had. And that is reviewable only on the basis of abuse of discretion. But Judge Barbier also went on and said, with respect to the 2015 memo, the same thing that I just said about the 2012 memo. Again, it lists down towards, it lists collateral, the UCC of all accounts, notes, and pledges receivable of the debtor. In this case, the debtor is covered through the production. Even under the financial reporting requirements, this is, by the way, under their exhibition. It's 2347 of the record. Under financial reporting requirements, annual tax returns and financial statements on borrowers, annual tax returns and financial statements on both guarantors. Why do you make that a requirement? By tax credits. And we'll never require anyone else to come up with payment. When you buy a note, a loan from the FDIC, you are entitled to rely on the loan document, not on some understanding, not on some representation, not on everybody's expectation that it's going to be paid off with tax credits. The whole point of security is that expectations don't always pan out the way you think they're going to. And you have backup. It's security. It is not your primary mode of payment. That's the whole point behind debt. And part of what Mr. Aaron is doing is he's trying to complicate what is ultimately a fairly straightforward issue. He's talking about everything that everyone expected was going to happen, the way these tax credit deals were structured. A lot of that isn't in the record. But it's a suit on a note. It's about as simple a case as you can get. They do not contest any of the basic elements of the suit. They don't contest that they executed the note. They don't contest that they executed the security agreement. Why would you execute a security agreement if it's just payable from tax credits? They don't contest that Oppmann executed a guarantee. They don't contest that the note matured. They don't contest that there was a balance due approximately $1.6 million at the time BY purchased the note. They don't contest they never paid it. Their answer is to blame FNBC. I'm not going to sit here and tell you that FNBC was a well-run machine. It's been dead now for eight years. The two officials that they went after in their third-party demand, Mr. Aaron mentioned, one of them's in jail and the other one may be out by now. But that's not BY Equity's issue. It's really fairly simple. And by the way, the other thing that they did, because there were two other, there were basically three affirmative defenses that they went for. The fraudulent inducement one was the first one that came up and it's the one they spent the most time on. But they also accused BY of various kinds of misconduct, unfair trade practices. And what the evidence shows, and this sort of dovetails as well with the Dench argument, is their unfair trade practices were based on the fact that BY was negotiating with the then-holder of the note, which was OSK, which bought it from the FDIC, at the same time that their client was negotiating with OSK about a possible book and that we knew they were negotiating. Well, notes are freely assigned. OSK can cut the best deal it wants. That's not an unfair trade practice. I mean, there's a pattern here of everything is everybody else's fault. BY Equity is just an investor. It buys a note. The note is in default. It's either going to get paid on the note or it will execute on the security. That kind of transaction happens thousands and thousands of times every day. And there is a recognized market in defaulted loans. All BY Equity did is buy a defaulted one. Everything else that happened afterward was BY trying to collect on the note. This suit was filed about six months after it purchased the note. Five months, actually. It's been pending now for over five years. There was a two-year stay while the criminal proceedings in the FMBC case were being handled. The note has been in default now for close to nine years. No one denies that the note was unpaid. They admitted it in their answer that the note was never paid. Their position is, well, it can only be essentially what they're trying to sell here is that the note could only be paid from the tax credits. That is contrary to the documents themselves, including the documents they're relying on. There is no such agreement. Fraudulent inducement is not a defense. There is no evidence of any unfair trade practice or fraud by BY Equities. It's just buying a note. Could you address Mr. Aaron, the third exhibit that has been published from January 26, 2015? He drew our attention to this paragraph about the personal cash flows of Dr. Eugene Oppmann. Right. I think that's the fifth of the bullet points. Right. This is an internal bank document talking about what they think Dr. Oppmann's personal guarantee might be able to cover. I mean, I can't dispute that that's what it says, but it has nothing to do, again, with the terms of the loan documents. That is what Dan Chin, that is what 1823B required the courts to focus on. Because otherwise, people in OSK's position or BY's position are never going to buy these failed institutions. By their nature, failed institutions are not necessarily well run. And there may be all sorts of things hidden away somewhere. I mean, that's what Dench was about. Supposedly, there was a secret deal that some note that looks like it's just a regular note wasn't ever going to have to be paid. And the Supreme Court said, well, not once the FDIC has to take this over. It has to rely on what's in the files. So this internal credit memo is talking about what they can expect to collect from Dr. Oppmann. But that's got nothing to do with the rights of a subsequent acquirer of the note, which has got Dr. Oppmann's guarantee. It's got a UCC security agreement that, among other things, gives the holder of the Newbridge loan a security interest with any notes that are held by Mr. Aron's client. That's what a buyer of the loan is entitled to rely on. And that's what BY relied on. I'm not here to defend FNBC. But I am here to say it doesn't matter what FNBC did unless it specifically agreed that it would only attempt to collect the note from the tax credits. They're in-realm mortgage loans. I mean, what I hear you saying is there's not even agreement. In your view, there's not even agreement to do that. No. Yes, that's the primary source of repayment. But there are other sources. Correct. Correct. They're trying to argue that that's what the agreement is. But if you think about in-realm mortgage loans, it's express. The loan can only be enforced against the property. Those kinds of loans are made in commercial contests all the time. That could have been done here, but it wasn't. They did exactly the opposite. They did what most lenders do, which is rely primarily on cash flows, or in this case on tax credits, and then secondarily on security. Their complaint is with Ashton Ryan and Brad Calloway at FNBC. And essentially, they're saying, Dr. Oppmann got snookered into making this loan, Dr. Oppmann being the principal of Carter Theoretic Productions, as well as an individual guarantor. I'm not here to offer a view on that one way or the other. My people weren't there. Gange says they don't have to have been there. They're entitled to rely on the documents. So unless there are any further questions, I will cede my last 30 thought seconds and sit down. Thank you, Counsel. Rebuttal. Yes, we claim fraudulent inducement, but we also allege that my equity conspired with others to basically infiltrate the company, hire one of their operatives as an employee to gain information, to gain access to the day-to-day operations and any vulnerabilities that my client might have. We also claim that they tortiously interfered with our attempt to buy the loan from OSK, who they bought it from. And basically what happened is this. We were basically saying, look, OSK, you can't enforce this thing for the full amount because that was never your intention. They come in and say, well, look, while they're trying to negotiate, we'll just pay you the full amount and knock them out. And that's how it went down. The other problem with what they're saying is this, is that they also tried to interfere with us dealing with the tax credit entity on the unwind. And if you notice the completings, you'll see the unwind was an issue. Basically, all we're saying is this. There were a lot of moving parts in this thing, and the trial court did not allow us to explore all the moving parts, the third-party demand, et cetera. All we did was just get cast in judgment and in a situation where it was clear that neither Carver Theater Productions, which was a company, a brand new company, had no assets, no credit score, nothing. That basically what was driving this thing was the tax credit. This loan was made to the Carver Theater, a historic property rising out of segregation when theaters were not open, in the Tremé section of New Orleans. The whole basis was this. We want economic development in this poor area. Dr. Oppen can't afford to do it. Nobody in their right mind is going to come in and put $8 million into this. So how do we do it? We find folks who need tax write-offs, credits. We sell those, and that's how we're able to do the project. So what we're basically saying is this. There are several genuine issues of material fact, notwithstanding what he's saying. They go beyond just the dense dome issue, and the trial court should not have granted summary judgment in the face of genuine issues of material fact. That's why we're here. Now, let's look at dense dome. Problem is this. I think it's a rare occasion when somebody can basically overcome dense dome. I think we are able to do it. It took us three attempts through FOIA requests. We tried through discovery. We got a deemed admission from Ashton Ryan, who basically was avoiding, but we served requests for admissions, and he admitted in there that the tax credits were to have paid the deal. So that's not an issue. What we're basically saying is this. The FDIC, looking at it in this package, but by an OSK, its ancestor and title were sophisticated players. What they should have done is said, look, let me look at this file. Give me the file. Give me the file. If they looked at the file, they would have seen the credit memos, and anybody looking at it would have gone like, whoa. Well, what's your response? Mr. Stern says, yeah, the primary source of repayment on the credit memo is tax credit equity proceeds of the state, etc., etc., etc., but there's a secondary source, and there are also guarantors on the credit memo. That's true. So a genuine issue of material fact is what is the actual liability of the guarantor after application of the tax credits? That's a genuine issue of material fact. The trial court didn't look to see, okay, what happened to the tax credits, because they went in. They were received. What happened to them, and why were they not applied? And so what we're basically saying is the trial court could have allowed us to show what they were. We know now it's $4 million, and had they been applied the $4 million, it would have basically wiped out the $1.8 million judgment that he has. And so I think, you know, what we're saying is give us the opportunity to show not only, you know, what should have happened, but was there money available to I think we're able to show. We can show that you got state historic tax credits came in, federal historic tax credits came in, new market tax credits came in, and also live entertainment tax credits came in from the State of Louisiana, and we can show it came in. And if we show it came in, it should have been applied to the bridge loan, and that's what we're saying. We wanted an opportunity to be able to show that, and the trial court denied us fundamental fairness and an opportunity to do that. That's what we're saying here, notwithstanding what Mr. Stern is saying. He's just saying, well, we bought this or whatever. To that argument, I say, well, you bought it, but you should have looked in the file. If you looked in the file, you would see the credit number, and it should have given you pause that, whoa, maybe we're buying a pig and a poke here that really we're buying a note that really never went into the file. That's my time here. Thank you very much. Thank you, counsel. The court will take this matter under advisement. That concludes the matter scheduled for our